Good morning, your honors. May it please the court, my name is Adolfo Hedda for petitioner Isidro Oropeza-Wong. Is this a key? Morning, Kev. Thank you, your honor. The central issue here is whether or not the immigration judge erred in finding that Mr. Isidro Oropeza-Wong had entered into a good faith marriage so as to be eligible to receive a marriage license. good faith waiver on his I-751 application. Thank you. Mr. Oropeza-Wong satisfied the requirement of filing a timely I-751 when he filed a I-751 within the period required. However, there are two methods to file the I-751. One is filing it as a joint petition with your spouse. And the other one is filing it on your own if you've been separated with the idea that you had entered into a good faith marriage. Mr. Oropeza-Wong argues that Mr. Oropeza-Wong was denied his good faith waiver by the service, which upon he was then referred to the court where he presented his case before the court. And the immigration judge also denied his good faith waiver. And in denying that waiver, in his appeal, Mr. Oropeza-Wong argued that his marriage was indeed based on good faith marriage because the definition for a good faith marriage is looking at it at what was the intention of the parties at the time that they were married. Now, in looking at a quick look at the facts of this case, this gentleman and his then wife who got the green card for him were married. They were married for a period of 14 months, and unfortunately, the marriage did not work out. But after the 14 months, the wife filed for the divorce, and shortly thereafter, Mr. Oropeza-Wong filed the I-751 waiver. The immigration judge denied the waiver. What is your evidence, just quickly, you said we put you through the facts that this marriage was in good faith? Your Honor, the evidence is that when they were married, he wasn't loved. I know there are issues before the court that the government raised that Mr. Oropeza-Wong had previously been removed a few years prior to this marriage, and that he had there was an issue of whether he had lied regarding to his relationship with another woman at that first removal. However, our argument is that at the time of his marriage to this person, he was no longer with them. He was in love with Ms. Renteria, who was the wife that petitioned for him. He did enter a valid marriage. He did commingle some assets. They did file one-year income tax together. He testified that they had lived with his family for that 14 months. The judge found an issue where she said they actually separated after eight or nine months. When in reality, they had not officially separated, but he had told her that the couple were both aware that and were agreeable to him going to work in Alaska so as to help the financial situation of the family. During this period in Alaska, the couple remained together. They remained in communication. Some of the letters that they wrote to each other during that absence was submitted as part of the record. And so it's his argument in brief that, although the marriage was brief, that at the time it was their intention to work it out, to fulfill their marriage. And... May it please the Court, I'm Susan Houser, paying for the Attorney General. I went over the evidence of the marriage in our brief at some length, but since the petitioner brought up the tax return, I'd just like to address that separately. The tax return follows the same pattern as all the other evidence of the alleged marriage. On page 54 of the record, there's an electronic filing signed by Melissa Oropisa. However, there's also a 1994 joint return which is filled out, which is unsigned by either party. That's in the record at 55 and 56, so the tax return really doesn't provide any evidence of the marriage either. But of course, the more important point here is that the Court lacks jurisdiction to review this discretionary waiver. After the government filed its brief in this case, two other circuits issued decisions on this issue, and the government filed a 28-J motion, which in these cases, these two other circuit courts in the field, found that Section 242A2B2i deprives any court of jurisdiction to review a waiver under 212C4. The Third Circuit in Arena-Tavarez noted specifically that this jurisdictional deprivation actually falls within the Ninth Circuit's rule that was stated in Spencer. The Third Circuit, and I'm quoting, says, And, you know, this Court in Spencer had held that the statute has to specifically say that the Attorney General is deprived of discretion, and as they noted, the statute in this case does say that. May I ask you about that? I was comparing 8CFR204.2C24 with 8CFR216.5E3, small 3, over 3 to 7, and it seems that the INS's own interpretation of this regulation confirms that the credible evidence provision does not strip the courts of jurisdiction to review credibility findings, but instead requires that the INS be more generous in admitting evidence while giving the INS flexibility to determine what weight should be given. You mean because the regulation sets out standards that the Court has jurisdiction over? Well, one thing that's different about the C-4 provision, which was also noted by the Third Circuit, is that in addition to the initial statement that it's up to the Attorney General, there's an additional statement which says that the determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General. So that makes it clear that these regulations are for the guidance of the agency and do not set forth standards that are, that would give a court jurisdiction. Nothing could be clearer than this, you know, double statement in the statutory provision. First, that it is committed to the discretion of the Attorney General, and then secondly, that even the determination of what evidence is to be found to be credible and the weight of the evidence is committed to the sole discretion of the Attorney General. The Fifth Circuit in Assad v. Ashcroft You know, that sort of disregards the whole history of those provisions. It turns provisions that were designed to be helpful to women into provisions that are harmful to women. That provision was part of the Violence Against Women's Act, and it applies to a whole series of immigration statutes where the agency was hostile to women and where they did not accept evidence that women were beaten without making women climb over all kinds of hurdles to get their evidence introduced. So Congress, intending to bring the agency into the 20th century, said you've got to treat these credibility provisions and determinations the way the rest of the world does. And this was only one of those various provisions, which you find throughout the Act now, that says you don't have these arbitrary, rigid standards, but you just, that the agency, you know, makes these credibility determinants. It was telling the agency how to make it and that it is the sole judge of the weight. You don't need expert testimony, as the agency had previously said. But it doesn't mean that you can't make it. It doesn't say anything about stripping the courts of the opportunity to see that beaten women, which is what this provision was designed for, abused women, should no longer have their cases reviewed. Well, in this case, the plain language of the statute is enough. We have the plain language of the jurisdictional provision. We have this Court's interpretation of that plain language provision in several different types of discretionary decisions, where the Court has held that this jurisdictional provision does strip courts of jurisdiction when the statute specifies that it's within the discretion of the attorney general. We have a statutory waiver in C-4 that could not be clearer that it's consigned to the discretion of the attorney general, even the factual findings. So it's, this is an example where the plain language rules, as found by both of the courts of appeals that were cited in our 28J letter. Well, that's what some other courts have said that may not have been as familiar with the history of this language. Well, you don't even reach legislative history unless the statutory language is not clear. Well, it's clear that the purpose of this is to require the attorney general to consider credible evidence, which he wasn't doing in the past. Well, if that were the purpose, then why would Congress do it? That's the first sentence of the provision. But if that were Congress's purpose, why would Congress, in the first place, institute this jurisdiction-stripping statute? In the second place you say it's a jurisdiction-stripping statute. I said you say it is a jurisdiction-stripping statute. That's the issue. It does deal with jurisdiction, and it limits the jurisdiction of the Federal courts. In cases where, and this Court has even interpreted the statute. It's not a new issue before the Court. This Court has held in many different situations that this jurisdiction has been taken away by these provisions. So these provisions were part of the Violence Against Women's Act. That wasn't a jurisdiction-stripping statute. Well, they're also part of the subchapter to which 244 goes. They were incorporated into the subchapter when Congress adopted the Violence Against Women's Act. But we have to presume that Congress knew what it was doing and knew that it was going to do it. Well, we do. But it's just a question of what it was doing. We presume it knew. But you think it knew it was stripping the courts of jurisdiction, and the other argument is it was trying to protect women against an arbitrary agency. Well, I don't understand how any person reading the waiver at section C-4 could construe it otherwise than stripping the court of jurisdiction under this Court's rule in Spencer. Because in Spencer, this Court talked about how the right or power to act is entirely within the attorney general's judgment or conscience. They're matters of pure discretion. And in C-4, it's abundantly clear that that's the case. Congress even went to the almost unheard-of extent of saying even the facts are the credibility of the facts and the weight of the facts are in the sole discretion of the attorney general. I don't know how Congress could have made that any clearer. If there are no further questions. Thank you very much. Your Honors, I would just like to make two quick points in that this Court addressed this issue of jurisdiction and review in 751s and Damon v. Ashcroft. And in there, they were talking about how the immigration judge is obligated to view the evidence presented from an objective point of view and not to use their personal conjecture to establish whether a marriage is good or not. In our case, in our brief, we presented that the immigration judge distorted the facts when, for example, two examples, she says that the petitioner presented no evidence from anybody else, from family or friends, to discuss the validity of the marriage, which conflicts with the fact that in the record, there's a letter from a friend who attested to the validity of the marriage. This was a letter from a nurse who had met them and met with both of them and was familiar with both of them. And additionally, as I stated before, the immigration judge said that the marriage had been terminated after a month. In reality, the marriage was terminated after 14 months when the wife filed the, the petition for divorce. That's all I have, Your Honors. Thank you, Ken. Case just argued will be submitted. The next case on the calendar is Somonia Kova versus
judges: D Nelson, Reinhardt, Thomas